JS−6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOINT STOCK COMPANY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RIVIERA TRAVEL AND TOURS, INC., et al.<br><br>Defendants.<br><br>_____<br><br>And Related Counter-claims | Case No.  CV 11-8362- BRO (AJWx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL** |

## I.

## INTRODUCTION

On October 7, 2011, Plaintiff Joint Stock Company, that is Aeroflot, the

Russian Airline, ("Aeroflot") brought this action against Riviera Travel and Tours and

1.

its owner, Caren Tumanian, (collectively, "Riviera"), alleging, among other things, a violation of:  (1) fraud; (2) tortious interference with contracts; (3) breach of contract; (4) breach of agency; and, (5) injunctive relief and disgorgement of profits under California Business and Professions Code section 17200.  (Dkt. No. 1.)  On September 17, 2012, Riviera Counterclaimed, alleging: (1) racketeering, in violation of 18 U.S.C. § 1962; (2) tortious interference with contract; (3) tortious interference with prospective economic advantage; (4) conspiracy; (5) declaratory relief; (6) trade libel; (8) defamation; (9) breach of the covenant of good faith and fair dealing; (10) fraud; (11) trade libel; (12) negligent supervision; (13) unjust enrichment; and, (14) injunctive relief and disgorgement of profits under California Business and Professions Code section 17200, among others.  (Dkt. No. 76.)

Federal law recognizes Aeroflot as a "foreign state". *See* 28 U.S.C. § 1603. Thus, the Court has federal diversity jurisdiction pursuant to 28 U.S.C. section 1332. There is no right to a jury trial.

After summary judgment motions on both sides, the Court proceeded to trial on Plaintiff's cause of action for injunctive relief under California Business and Professions Code section 17200.  In addition, the Court tried six of Riviera's counter-claims, for trade libel, defamation, tortious interference with prospective economic relations, unjust enrichment, injunctive relief under California Business and Professions Code section 17200, and declaratory relief.  (Dkt. Nos. 187, 191, 194.) The Court also heard Riviera's action against Mr. Alexey Aleksandrov for Conversion.

All causes of action against Mr. Andrey Novokshonov had previously been dismissed.

On March 5 through March 6, 2014, March 11 through March 12, 2014 and March 17, 2014, the Court tried this matter.  The Court has considered the parties' trial briefs, the witnesses and evidence presented by both sides at trial in the case, as well as arguments of counsel, Plaintiffs' Proposed Findings of Fact and Conclusions of Law, (Dkt. No. 254), Defendants' Objections to the Proposed Findings of Fact and Conclusions of Law,[1] (Dkt. No. 255) and Plaintiffs' Reply (Dkt. No. 256.) Accordingly, the Court makes the following Findings of Fact and Conclusions of Law.[2]

## II.

## FINDINGS OF FACT

A. Admitted Facts

Plaintiff Aeroflot and Defendant Riviera agree to certain proposed findings, which the Court finds as true.

> 1. At all times relevant to this lawsuit, Aeroflot was and is: (a) a corporation organized and existing under the laws of the government of the Russian Federation with its principal place of business in Moscow, Russia; (b) an instrumentality of a foreign state in that it is a

---

[1] Riviera's Objections consist predominantly of contrary opinions regarding the evidence presented. The objections are OVERRULED to the extent the objections are inconsistent with the Court's findings of fact and conclusions of law.
[2] Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law.

separate legal person, a majority of whose shares or other ownership interest is owned by the government of the Russian Federation; and (c) an airline engaged in the international transportation of passengers by air.

2. As with other airlines, Aeroflot sells its tickets in various ways, including sales through travel agents that are authorized to reserve seats from Aeroflot's inventory and to sell Aeroflot tickets to the general public in accordance with fare rules and prices established by Aeroflot.

3. Riviera Travel and Tours, Inc. is a California travel agent in the business of reserving and selling airline tickets with airlines such as Aeroflot utilizing a computerized global distribution system known as SABRE.

4. Until December 8, 2010, Riviera was one of approximately 17,000 retail travel agencies authorized to sell Aeroflot tickets.

5. SABRE is a computerized global distribution system used by airlines and travel agents, including Aeroflot and Riviera, which contains: (a) the current inventory of available airline seats in each class of service; and (b) the corresponding fare basis and fare rules applicable to each seat and class of service.

6. The SABRE system allows subscribing travel agents to: (a) reserve

4.

airline seats from available airline inventory; and (b) price and pay for those seats in accordance with authorized fares and fare rules.

7. The fares and fare rules published by Aeroflot, and many other airlines, are contained in the SABRE system and are used to automatically price Aeroflot tickets.

8. The Airlines Reporting Corporation ("ARC") acts as a clearing house for the processing and payment of airline tickets booked and sold by travel agencies using the SABRE system.

9. As a result of Riviera's conduct, Aeroflot terminated its business relationship with Riviera on or about December 8, 2010.

10. Tumanian admitted that she submitted used tickets for refund over a period of two to two and a half months.

11. Tumanian admitted that she kept the practice of submitting the fraudulent refunds secret from everyone other than her business manager.

12. Tumanian further admitted that she did not stop submitting used tickets for refunds until she was caught in a surprise audit conducted by ARC.

B. Trial Testimony

The following summarized testimony reflects the testimony presented to the Court in the order in which it was presented, which the Court finds to be relevant and

5.

credible.

### 1. Andrey Novokshonov

Mr. Novokshonov serves as Aeroflot's general director for the United States and has done so since September 2010.  "Booking" in the airline context means when an agent makes a reservation.  As soon as the reservation is properly completed, an agent may issue tickets against this reservation. Each airline has a fare structure, selling airline seats in different classes of service.  In booking a ticket, a travel agent should book a seat corresponding to the booking class of service in the airline inventory at the time.  "Invalid booking class of service" means that the travel agent booked one class of seat when the class of service was unavailable in the airline inventory at the time.  Novokshonov believes that invalid booking of classes of service constitutes fare abuse.  Aeroflot loses revenue when a travel agent makes invalid bookings are made. A debit memo is a document created by the airline and sent to the travel agency when a financial discrepancy exists, in essence where the airline states that the travel agency owes it money.  Aeroflot refers to the debit memos as an agency debit memo or ADM.  ARC acts as a clearinghouse, with payments from a travel agent's sales going through ARC to the airline.

In May 2010, Aeroflot employees discovered fare abuse by Riviera.  The Aeroflot employees, who worked at Los Angeles International Airport, brought the issue to the attention of Aeroflot executives in New York.  Thereafter, Aeroflot conducted an audit.  Aeroflot audited all ARC agencies for 2010.  The employees

6.

analyzed whether there was a difference between the fare charged and the ticket flown. The audit identified three travel agencies where there were fare discrepancies, one of which was Riviera.

As a result of the audit, on November 26, 2010, Novokshonov met with Riviera owner, Ms. Caren Tumanian.  At the time of the meeting, Aeroflot had previously sent Riviera debit memos totaling $60,000, approximately $35,000 of which was related to fare abuse.  In addition, the audit identified $140,000 in lost revenue to Aeroflot as a result of the booking discrepancies. After the November 26, 2010 meeting, Aeroflot identified that approximately 80 per cent of the 400 fare memos contained fare abuse. None of the 400 debit memos contained evidence of permission to Riviera to issue those tickets. Novokshonov's review of the entire file does not reveal a documents authorizing the booking practice.  After the audit, Aeroflot determined that Riviera's fare abuse violations totaled $400,000. Tumanian agreed to pay $30,000 to Aeroflot as a sign of good faith, pay undisputed ADMs and identify disputed ADMs. Aeroflot requested payment for the violations with seven (7) days of the meeting.

Exhibit 24, initialed by the parties, describes the November 26, 2010 meeting. During the meeting, Tumanian (or any other Riviera person) never stated to the Aeroflot employees at the meeting that Aeroflot authorized the fare violations.[3] At the meeting, Tumanian offered to pay $30,000 as a sign of good faith and pay all debit

---

[3] From September 2010 and after, no one from Riviera ever informed Novokshonov that fare abuse ADMs were not improper because the bookings were authorized by Aeroflot.

memos to which they agreed. On December 3 and December 7, 2010, Tumanian described her account of the November meeting.  Tumanian's letters, Exhibits 26 and 31, explained that Riviera was ready to reinstate a lapsed $70,000 bond.  In addition, Tumanian offered to pay the correct debit memos and contest others.  Tumanian stated her willingness to pay Aeroflot $30,000.  On December 8, 2010, Aeroflot terminated its relationship with Tumanian and Riviera. The next day, Riviera provided a check to Aeroflot in the amount of $30,000, which Aeroflot eventually credited to Riviera's debt. Riviera never provided a list of disputed or undisputed ADMs.

No one within Aeroflot North America had the authority to permit a travel agency or traveler to book a higher class of service and pay for it as a lower class of service. Any bookings outside the rules required written permission from Aeroflot. No one at Aeroflot has permission to authorize a travel agency to issue a ticket in a class of service which is unavailable at the time of booking.  Anyone at Aeroflot who authorized Riviera to issue tickets at a different class of service than the one for which they paid would be fired.

In April 2011, Novokshonov noticed that Riviera had been submitting used tickets for refunds.  SABRE rules require travel agents who seek to issue a ticket outside the pricing mechanism provided by SABRE must receive permission from the airline. After Riviera's December 8 termination, Riviera began acting as a sub agency and booking Aeroflot tickets through the SABRE system. A customer would not be able to discern whether Riviera was an authorizes Aeroflot agency.

Exhibit 103 is an internal Aeroflot memorandum where Novokshonov details the decision by Andrey Yurievich Kalmykov to terminate the contract with Riviera. Thereafter, Novokshonov informed ARC of Riviera's inability to issue new Aeroflot tickets.

The sales manager of Aeroflot New York stated in correspondence to Airline Reporting Corporation (ARC) that Riviera was an incompetent agency.

### 2. *Alexey Aleksandrov Testimony*

Mr. Aleksandrov serves as the advisor in the Ministry of Transportation in Russia. Prior to his current position, Aleksandrov worked for Aeroflot for 19 years. During his tenure with Aeroflot, Aleksandrov worked as a maintenance engineer, flight service manager, deputy manager for Aeroflot in Greece and in Toronto, Canada, and culminated in his service as the general manager for Aeroflot Los Angeles. Aleksandrov began his position as the Los Angeles general manager on November 22, 2010.

Four days later, Aleksandrov attended a meeting with Sergei Maksunov, Aeroflot's previous general manager in Los Angeles, Tumanian and another Riviera employee. The purpose of the meeting was an introduction and to discuss the previously provided ADM showing fare abuse, totaling $64,000. When confronted with the topic, Tumanian stated that she needed time to research the issue and provide an answer to Aeroflot. At the meeting, Riviera also agreed to provide Aeroflot with explanations of the ADMs and a schedule of payments within seven (7) days on the

9.

undisputed ADMs. During the November 26, 2010 meeting, neither Tumanian, nor any Riviera representative, ever mentioned the topic of receiving verbal authorization from Aeroflot for the fare abuse violations. Aleksandrov doesn't remember Tumanian talking about being willing to pay a particular amount. Aleksandrov signed Exhibit 24, the minutes generated from that meeting. Exhibit 25 reflects Aleksandrov's letter of December 3, 2010 confirming that he provided additional ADMs with Tumanian on December 1.  During the December 1, 2010, meeting Tumanian never stated that she had been given verbal authorization from Aeroflot to book the airline seats at a higher class of service but charge a price at a lower class of service.

At a December 3, 2010 meeting, Tumanian agreed to provide the letter of credit requested by Aeroflot. She failed to provide a schedule for payments or any explanation regarding the ADMs. Exhibit 26, the December 3, 2010 letter written by Tumanian, requests additional time to review the ADMs and states her agreement to provide a check for $30,000 to Aeroflot.  Specifically, Tumanian agreed to provide the $30,000 check the following Monday (December 6, 2010) as a gesture of Riviera's good will. Tumanian also complained about Aeroflot's conduct in Los Angeles.

Later, on December 7, 2010, Aleksandrov delivered additional ADMs with Riviera and again met with Tumanian. Tumanian reiterated her intent to pay Aeroflot $30,000 as a gesture of good will.  She also restated her intention to obtain a new

$70,000 line of credit in favor of Aeroflot.[4] Again, Tumanian never mentioned that she (or anyone at Riviera) had received verbal authorization to book a fare at a higher class, but charge the price for a lower class of service.  Tumanian never provided a schedule of payments or explanation of the fare violations.

On December 8, 2010, Aleksandrov received permission from Aeroflot's Commercial Director, Mr. Kalmykov, to terminate Riviera's status.  Kalmykov's decision was conveyed to Novokshonov who emailed Tumanian that Riviera's agent status was to be terminated. On December 9, 2010, Aleksandrov met with Tumanian where Tumanian provided him with a $30,000 check, Exhibit 34.[5]  Aleksandrov never told Tumanian that Aeroflot would reinstate Riviera if Riviera paid the $30,000, rather he believed the check to demonstrate Riviera's good will. Neither Novokshonov nor Aleksandrov had the authority to re-instate Riviera's agency status.  The necessary permission would have to come from Moscow.

Aleksandrov never heard any statements made by Aeroflot employees that Riviera was a fraudulent or illegal company. Based upon Aleksandrov's knowledge of the rules, no one at Aeroflot directed Riviera to issue tickets at discounted rates. SABRE rules require written permission from the airline to deviate from the rates.

///

---

[4] Aeroflot also required Riviera to provide a $75,000 bank guarantee in addition to the reinstatement of the $70,000 line of credit.

[5] Neither Tumanian nor anyone else at Riviera ever asked Aeroflot to return the $30,000 check.

### 3.  Dragan Drobnjak Testimony

Mr. Drobnjak works a sales manager for Aeroflot, USA.  Drobnjak  began with Aeroflot 22 years ago, first as a ticketing reservation agent, then ARC supervisor, followed by manager of reservations and ticketing.  Aeroflot next promoted Drobnjak to sales manager for Aeroflot USA.  As a sales manager, Drobnjak develops sales for Aeroflot in the United States and interacts with travel agencies.  Drobnjak also processes debit memos.  He has, as a part of his duties, used and continues to use the SABRE system on a daily basis.  He is certified on the SABRE system and a certified specialist for ARC.  In addition, Drobnjak serves on a board which is consulted by ARC on various issues, including fraud.  Drobnjak serves as a member of the Computerized Airline Sales Manager Association (CASMA) .

SABRE is a global reservation system. It can be utilized for reservations, sales and ticketing of airline tickets.  All airline ticket seats are divided by the class of service, or reservation booking designators (RBDs).[6]  Each class of service is assigned a unique letter code, or RBD. Each letter has an assigned fare basis code and rules. The fare basis code determines the price of the ticket. "Inventory" describes the number of seats available within a class of service.  The revenue department of Aeroflot, located in Moscow, determines the number of seats to assign to each RBD. This process works through SABRE and Aeroflot provides SABRE with access to its

---

[6] There can be multiple classes of service within one cabin.  For example, economy class may have multiple classes of service within it, for example, economy, and full fare refundable.

inventory. The inventory is automatically updated.  Fares are downloaded through the Airline Tariff Publishing Company.  SABRE also lists the schedules, fare basis and price chargeable for available tickets.  Drobnjak does not have authority to change inventory. Based upon his experience, he would expect every employee of Aeroflot to understand that they lack the authority to change the inventory plan established in Moscow.  Drobnjak would also expect Aeroflot employees to know that they could not sell a ticket if there was no inventory in the particular class of service.

A traditional SABRE booking process would start with the reservation by the travel agent.  First, the agent would obtain the name of the passenger, then the flight segment (consisting of the airline code and flight number). After that, the agent would obtain the class of service, or RBD, the city pairing, and finally the departure and arrival times. SABRE also sets the price automatically, and as a result guarantees the fare. At the end of the flight segment portion, the travel agent must obtain a unique, record locator code. SABRE would communicate with Aeroflot's central computer reservation system which would assign a seat and record locator, and send the information back to SABRE. The record is also referred to as a passenger name record or PNR.  There is also a time limit within which to issue the ticket.

No travel agent has the authority issue a ticket in a class of service which is unavailable. Nor does a travel agent have permission to manually price a ticket. Travel agents are not permitted to issue tickets using passive segments, or a segment that a travel agent makes in its system outside of SABRE or the airline. No one at Aeroflot

is authorized to manually price a ticket. Nor is anyone at ARC permitted to issue a ticket in a class of service which is not currently available.

Exhibit 7 refers to the SABRE code of conduct.  In essence, the document details instructions to travel agents as to how to use SABRE.  SABRE prohibits the use of passive segments because they do not generate messages to the airlines. As a result, the airline does not reserve the seat on the airplane.

ARC acts as the payment clearinghouse for airlines.  When a passive segment is used, there is a higher class of service than is reserved in the inventory. The passive segment is then sent to ARC for payment, but not Aeroflot to reserve the seat. If this happens, the airline does not receive the full payment for the ticket.

With respect to Riviera, Drobnjak and his team reviewed the 390 cases (PNRs) of fare abuse violations, Exhibit 39. None of the PNRs were auto-priced by SABRE, but rather manually priced at a price which was inconsistent with the ticket that was reserved. All 390 PNRs involved issuing a ticket in a class of service which was not available at the time the reservation was booked, but by manually pricing the ticket. In each case, the fare basis was lower than the price of the ticket which was reserved. In each case, the reservation portion of the booking was completed properly. However, the fare paid was approximately 50% of the actual fare. Approximately 77%

of the tickets were issued by paper and passive segments. The remaining 23% were manually booked but electronically issued.[7]

A debit memo is a note to the travel agency stating that the agency has committed an act and, as a result, Aeroflot is owed money. Drobnjak delivered debit memos for fare abuse violations to Riviera during the period from July 2, 2010 to November 26, 2010.  The debit memos were not prepared from the Memo Manager, but rather Aeroflot prepared them manually because at the time, Aeroflot did not participate in Memo Manager. Aeroflot delivered the first debit memo to Riviera on July 2, 2010.  As of November 26, 2010, Aeroflot presented Riviera with debit memos totaling approximately $35,000 in fare abuse violations.

Exhibit 39 reflects the packet created by Drobnjak of the fare abuse violations and supporting documents. Each of the 390 fare violation packets shows a manually priced ticket, each reflecting the sale of a ticket at a fare which was lower than the authorized fare.  Each also involves the sale of a ticket where the class of service sold was not available at the time the ticket was issued. Exhibit 40 summarizes the fare abuse violations detailed in Exhibit 39.

Exhibit 29 describes in detail one of the fare abuse violations. The record locator is listed and the date of April 20, 2011, reflecting date on which the

---

[7] During this time frame, Riviera signed a net fare agreement with Aeroflot, where Riviera acted as a consolidator.  As an airline consolidator, Riviera would be able to offer seats up to 30% lower than a ticket available directly from Aeroflot.

reservation was obtained from the system. The next date, May 4, 2010, identifies the date when the reservation was made.  Riviera's pseudo-city code, NS05, is also listed. The reservation shows "S" class service on Aeroflot flight, SU322.  "S" class is an expensive class of service, approximately $3,000.  The travel day June 19, 2010 and airline codes are included. The return, set for July 16, 2010, was booked in "K" class. As a result, one "S" class seat from Los Angeles to Yerevan and one "K" class service from Yerevan to Los Angeles was taken from Aeroflot's computerized inventory. Looking at the actual flight coupon, it shows that two segments, from Los Angeles to Moscow and Moscow to Yerevan, were issued in "Q" class, a lower class of service. The return flight was booked in "K" class of service and issued in "K" class. Cross referencing the ticket with the ARC document shows that the ticket was manually priced. Instead of being paid $2,110 for the ticket booked in "S" class and "K" class, Aeroflot was paid $920, for the ticket issued in "Q" class and "K" class, yielding a loss to Aeroflot of $1,190.  The documents also show that the passive segment was booked from Riviera, someone using Tumanian's computer. Thus, a ticket was issued under that lower class of service, payment arranged, and finally someone using Tumanian's computer cancelled the passive segment.

At no time did anyone provide this information to Aeroflot. Aeroflot then issued a debit memo to Riviera, with the notation "invalid booking class of service. PNR booked in S and K and ticketed in Q and K."  Aeroflot next calculated the

difference in fare, $1190, deducted the 9 per cent commission, for a total owed to Aeroflot of $1,082.90.  Aeroflot sent this ADM to Riviera on July 10, 2010.

Aeroflot eventually incorporated the debit memos into ARC's computerized Memo Manager.  ARC Memo Manager permits a travel agent to dispute a debit memo three times. With respect to Exhibit 29, Riviera entered the following explanation: "Last-minute booking.  Death in the family.  Requested authorization from S.U." This response essentially explained that the flight had to be cancelled and rebooked on short notice.  Aeroflot refused this explanation because this reservation was made on May 4, ticketed on May 25 and flown on June 19.  As a result, it did not appear to be a death in the family, which would necessitate immediate travel.  Specifically, Aeroflot stated: "Agency argument not applicable to invalid class of service. Waivers are never given for tickets issued in invalid class of service." Aeroflot also rejected the notion that the ticket was booked on short notice, because the ticket was reserved weeks before the ticketing and travel.

Of the 390 debit memos to Riviera reviewed by Drobnjak, Riviera did not supply an explanation for 300. Riviera disputed approximately one-fourth of the ADMs, but provided illogical explanations. None of the explanations ever stated that Aeroflot authorized the ticketing in that manner.  From July 2, 2010 to the filing of this action, no one from Riviera ever communicated with Drobnjak that the fare violations were authorized by Aeroflot.

"Cross-border violations" are also called "point beyond sale" violations. This occurs when, for example, the airfare from Los Angeles to Yerevan is cheaper than the airfare from Los Angeles to Moscow.  When a passenger purchases a ticket from Los Angeles to Moscow, Moscow to Yerevan, and travels only on the Los Angeles to Moscow leg, the passenger commits a cross-border violation. The Riviera audit revealed 12 cross-border violations. ARC forbids cross-border violations.

In late, March 2011, after Aeroflot terminated its relationship with Riviera, Aeroflot learned that Riviera sought and obtained $140,000 in refunds for tickets actually flown. After that discovery, ARC emailed Drobnjak that Riviera submitted the same $20,000 credit memo twice.

Riviera continued to book tickets after Aeroflot terminated its relationship with Riviera.  Subagents have the ability to book fares on Aeroflot through SABRE. A passenger cannot tell how an agency books its tickets.  As a result, Riviera still has the ability to book tickets on Aeroflot.  However, Riviera should not be able to issue tickets for Aeroflot flights.  Travel agents or subagents report the issuing of a ticket through ARC, and ARC prohibits Riviera from ticketing on Aeroflot.  Drobnjak asked SABRE to prohibit Riviera from booking Aeroflot tickets.  Nonetheless, Aeroflot cannot, through either SABRE or ARC, ensure that Riviera is not booking Aeroflot flights. For example, GTT permits Riviera to sell Aeroflot tickets.

Another travel agency called Drobnjak, complaining that it had a client seeking four business class seats to Moscow in "D" class, low business class fares.  The travel

agent checked the availability and found it to be unavailable. Thereafter, the client

called another travel agency and obtained the four seats at "D" class. That same day,

Drobnjak received an email from the Aeroflot Los Angeles manager with a

reservation booked by Riviera.  The reservation showed a reservation in "J" class, a

higher class of service, but issued in "D" class.  Riviera booked the reservation as a

subagent for another agency.  That same day, Drobnjak confirmed that "D" class was

not available.

One passenger complained to Aeroflot about an Aeroflot flight booked through

Riviera.  He stated that he had flown with Aeroflot for 10 years and never requested a

refund.  When he did request a refund through Riviera, Riviera demanded a $420 fee.

Drobnjak checked the rules and determined that the appropriate refund fee was $100.

The passenger contacted Aeroflot because he believed that Riviera was an agent for

Aeroflot.

Travel agents are given a waiver code, to be used when they need to make a

schedule change to a ticket which has been issued, for example, when Aeroflot

cancels a flight.  Exhibit 101 reflects an example where Aeroflot issued an involuntary

refund because the passenger was hospitalized.  In that instance, Drobnjak authorized

the waiver.  At most Aeroflot is authorized to waive a penalty if a passenger is

hospitalized, for example.

In exhibit 145, Drobnjak sent an email to Ms. Debbie Erickson of ARC.  In that

email, Drobnjak stated that there was "clear evidence of criminal activity" done by

19.

Riviera. In Exhibit 146, Drobnjak sent another email, to Mr. Michael White of ARC, writing, "trying to submit a credit memo that is not authorized by the airline with the same number of the credit memo that was settled once already with the hope that the airline will not catch it is fraud and criminal activity." The email further queries Mr. White whether this conduct would be sufficient to place Riviera in default, thereby prohibiting the agency from issuing Aeroflot tickets.

### 4. Irina Sokoletskya Testimony

Aeroflot employed Sokoletskya from 2002 to 2007, as an airport supervisor and ticket counter supervisor. In 2007, Aeroflot terminated Sokoletskya's employment. She worked both in Beverly Hills and at LAX. The Court finds the rest of Sokoletskya's testimony either irrelevant or not credible. To the extent it is not credible, the Court discusses credibility in a subsequent section.

### 5. Gurgen Mikaelyan Testimony[8]

Mikaelyan flew Aeroflot in 2009 and 2010. He purchased his ticket from Riviera to fly on Aeroflot. He shopped around for a price which he booked at one price, but when he went to Aeroflot, it quoted Mikaelyan a more expensive price. Aeroflot then referred him to Riviera, telling Mikaelyan that Riviera would provide him the ticket at the lower price. Riviera did sell Mikaelyan the ticket at the lower price. When Mikaelyan arrived at the airport, Mikaelyan complained, spoke to a

---

[8] Aeroflot preserved its objection to the testimony of Mikaelyan. The Court, however, finds that the portion regarding verbal authorization rebuts Aleksandrov's testimony.

manager, who resolved the issue. Aeroflot employees stated that Riviera's tickets were "not legit." Mikaelyan does not know the class of service of the ticket.  Nor does Mikaelyan know that Riviera had a net fare agreement with Aeroflot thus enabling Riviera to sell tickets more cheaply than Aeroflot.  Mikaelyan does not know whether the person he spoke with at LAX worked for Aeroflot nor was a third party contractor.

### 6.  Armen Buniatyan Testimony

Buniatyan purchased Aeroflot tickets from Riviera once in June 2013.  He went to the airport to fly to Russia with his wife, daughter and mother-in-law.  All of the tickets were valid except his daughter's ticket.  After approximately 45 minutes, the entire party was able to fly. During the course of this 45-minute discussion, one employee rolled his eyes and said "they always issue invalid tickets." However, the Aeroflot representative told him they had located the child's ticket. Buniatyan does not know in which class of service his tickets were booked. Nor does Buniatyan know whether the Aeroflot representatives with whom he spoke at LAX were employed by Aeroflot or a third party.

### 7.  Vinay Gandhi Testimony

Gandhi manages Riviera since 2005.  He manages corporate clients and sells tickets. The $30,000 payment to Aeroflot was a check outside of the Memo Manager system.  Riviera purchases Aeroflot tickets through GTT.  Exhibit 11 details a conversation between Gandhi and the auditor.  Gandhi stated that he did not know how a ticket could be refunded if it had been used.  He did know, however, that

Riviera sought refunds for flown tickets, and later told the auditor that it was because of "issues" with Aeroflot. Gandhi also pleaded with the auditor for more time to pay the debit memos.

### 8. Caren Tumanian Testimony

Tumanian serves as the President of Riviera since its incorporation in approximately 2000. Tumanian admits that she processed over 100 flown Aeroflot tickets for refunds.[9] Aleksandrov, acting under instructions from Novokshonov, asked Riviera to post a $75,000 bond in addition to its current $70,000 letter of credit. Tumanian did not provide Aeroflot with an explanation or payment schedule within the deadline agreed upon at her November 26, 2010 meeting with Novokshonov, Aleksandrov and Maksunov, and memorialized in Exhibit 24, bearing her signature. Tumanian submitted Exhibit 14 to Aeroflot for payment twice, once in May 2010 and once in 2011 after Aeroflot terminated Riviera. Tumanian wrote Exhibit 26, a letter to Aleksandrov and Novokshonov dated December 3, 2010, but never explained to Aeroflot that the demit memos were not fare abuse violations because Aeroflot authorized the booking in a higher class of service but payment in a lower class of service.  On February 2, 2011, Tumanian wrote Exhibit 130 to Levitin, the Minister of Transportation, complaining about Aeroflot.  She never informed Levitin that Riviera had not engaged in fare abuse violations because Aeroflot authorized the conduct.

---

[9] The Court specifically rejects Tumanian's testimony that she processed these tickets to get the attention of Aeroflot and did not intend to keep the money.

Tumanian never put in her December 3, 2010 or her December 7, 2010 letter that Riviera did not engage in fare abuse because Aeroflot authorized the fares. When disputing the 390 debit memos in ARC's Memo Manager, Tumanian never entered the reason that Riviera did not engage in fare abuse because Aeroflot authorized the fares.

In April 2008, as reflected in Exhibit 44, Aeroflot informed Tumanian that it would not tolerate further issuing of tickets that did not match reservations. The International Air Transport Association (IATA) views cross-border violations as an improper practice. Because she believed Aeroflot to be unresponsive, for over two months, Tumanian submitted 167 tickets which had been flown for refunds. She did not stop the practice until ARC conducted its audit. This was a misrepresentation on her part.

### 9. Dr. Jules Kamin Testimony

Dr. Kamin earned his bachelor's degree in applied science and engineering, a Master of Economics and a Master of Arts and Economics from the University of Toronto. He also earned a master of business administration and doctor of philosophy from the University of Chicago. Currently, he works as an economist, and has 40 years of experience in the field of economics. He has lectured at both the University of California at Los Angeles and the University of Southern California. Dr. Kamin was employed as a senior financial analyst, manager of economic analysis, and manager of industry economics. In 1991, he formed his own company, practicing

forensic economics.  He has testified as an expert witness as to monetary damages in business matters.

He reviewed Riviera's corporate tax returns from 2001 to 2011, as well as discs showing ARC transactions, and Excel computer files from GTT from 2011 to 2012. Riviera asked him to estimate its money damages in lost profits, as well as any diminished value as a result of any defamation. Specifically, Dr. Kamin did not parse out what specific damages were caused by any specific wrongful conduct.  Nor did Dr. Kamin offer an opinion as to causation, that any Aeroflot conduct caused Riviera damages. The principal document upon which he relied in coming to his opinion was a draft letter from Mr. Deloveri, setting forth sales data for a four-month period in 2004.

### 10.  Aramis Paronyan Testimony

Aleksandrov met with Tumanian and told Tumanian she should write a letter to Aeroflot.   If Tumanian did not write the letter, it would affect Riviera's relationship with Aeroflot.

### 11.  Olga Kornilova Testimony

Kornilova began working for Aeroflot in 1998, and currently holds the position of senior reservation and ticketing agent.  She has always worked in the Beverly Hills office of Aeroflot. All of the ticketing agents sit in one room together. She does not have authority to permit travel agencies, such as Riviera, to issue tickets where the class of service does not match the class of service on the reservation. No Aeroflot

24.

employee in the United States has such authority. She never told Riviera that they could issue tickets that did not match the class of service in the booking.  Nor did she ever hear any of her coworkers give such authorization.

### 12.  Haik Airapetin Testimony

Airapetin works for Riviera and knows Kornilova.  He is in a romantic relationship with Tumanian where the two have a child together.

## C. Credibility Determinations

Ninth Circuit Model Jury Instruction 1.11 provides guidance to jurors when assessing credibility.  The factors include:  (1)  the opportunity and ability of the witness to see or hear or know the things testified to;  (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case and any bias or prejudice; (5) whether other evidence contradicted the witness's testimony; (6) the reasonableness of the witness's testimony in light of all the evidence; and, (7) any other factors that bear on believability.  Ninth Cir. Model Jury Instr. 1.11 (Civil) (2007).  The Court finds these factors helpful in assessing the credibility of the witnesses.

First, the Court finds Plaintiff Tumanian's testimony, other than that listed above, to be *not credible*.  The Court observed her demeanor while testifying. His testimony contradicts prior statements, such as Tumanian's statements to the auditor as recorded in Exhibit 11.  Tumanian's memory was selective; she remembered certain things when asked by her attorney, but could not remember when asked by

opposing counsel.  Tumanian admitted to submitting used tickets for refunds.  Yet, she sought to minimize her behavior, claiming that she never intended to defraud Aeroflot.  This testimony is simply not credible.  Gandhi's testimony corroborates the true reason for seeking refunds on tickets which had been used.  Tumanian sought to punish Aeroflot.  Exhibit 24, signed by Tumanian, does not state that Aeroflot authorized Riviera to engage in fare abuse.  Likewise, exhibits 26 and 31, written by Tumanian, shows a willingness to pay Aeroflot $30,000 and not coerced by Aleksandrov.  In addition, the exhibits do not reflect the claimed authorization from Aeroflot for the fare violations.  The Court observed Tumanian's demeanor and found her to be evasive at times and feign a lack of understanding.  In addition, Tumanian's has a significant interest in the outcome of the case.  As a result, the Court finds Ms. Tumanian to be not credible.

Likewise, Sokoletskya's testimony is *not credible*.  The Court, having observed her demeanor, found her to be evasive and feign a lack of understanding.  She was disciplined, yet cannot remember the events underlying such discipline.  Her testimony is vague and contradicted by Kornilova's testimony.  Aeroflot terminated Sokoletskya and her testimony, including her modulation, reflected animus towards Aeroflot.

Airapetin's relationship and child with Tumanian makes his testimony suspect.  In addition, having observed his demeanor while testifying, he too bears animus toward Aeroflot.  Based upon his relationship, he has an interest in the outcome of the

case.  Thus, the Court finds his testimony *not credible*.

In contrast, the Court finds the testimony of  Novokshonov, Aleksandrov, Drobnjak and Kornilova to be *credible*.  The Court observed their demeanor and found them to be credible witnesses.  Although they may still work for Aeroflot, their testimony is mutually corroborative.  Each witness testified in a straightforward manner and had nothing to gain from the outcome of the case.  Accordingly, the Court deems their testimony to be *credible*.

With respect to Paronyan, Buniatyan and Mikaelyan, the Court finds their testimony to be *credible*.  The Court observed the demeanor of the witnesses, and found them to be believable.  In addition, their testimony is consistent with the documents and with each other.  The witnesses responded to questions in a straightforward and forthright manner.  They presented as unbiased witnesses who simply answered the questions.  Accordingly, the Court believes their testimony.

### III.

### CONCLUSION OF LAW

A. Aeroflot's Claim under sections 17200, *et seq*.:

"To state a claim for unfair competition pursuant to Cal. Bus. & Prof. Code § 17200, a plaintiff must establish that a practice is either unlawful, unfair, or fraudulent." *Kearney v. Hyundai Motor Co.*, No. SACV 09-1298 DOC, 2010 WL 9093204, at *9 (C.D. Cal. June 4, 2010) (citing *Sonoma Foods, Inc. v. Sonoma Cheese*

*Factory, LLC,* 634 F.Supp.2d 1009, 1022 (N.D.Cal.2007)). Under the unfair

competition law ("UCL"), "[p]revailing plaintiffs are generally limited to injunctive

relief and restitution." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th

163, 179 (1999).

### 1. *"Unlawful" Prong of the UCL*

The coverage of the unlawful prong is sweeping, covering "anything that can

properly be called a business practice and that at the same time is forbidden by law."

*Cel-Tech*, 20 Cal.4th at 180 (internal quotation marks omitted).

### 2. *"Unfair" Prong of the UCL*

The Ninth Circuit has recognized two tests for determining the "unfair" prong

of the UCL. Under the first test, "[a] business practice is unfair within the meaning of

the UCL if it violates established public policy or if it is immoral, unethical,

oppressive or unscrupulous and causes injury to consumers which outweighs its

benefits." *McKell v. Wash. Mut., Inc.,* 142 Cal.App.4th 1457, 1473 (2006). Under the

second test, "'any finding of unfairness ... [must] be tethered to some legislatively

declared policy.'" *Spiegler v. Home Depot U.S.A., Inc.*, 552 F.Supp.2d 1036, 1045

(C.D. Cal. 2008) *aff'd sub nom. Spiegler v. Home Depot USA, Inc.*, 349 F. App'x 174

(9th Cir. 2009) (quoting *Cel–Tech,*20 Cal.4th at 186). "According to the Ninth Circuit,

after *Cel–Tech,* courts faced with consumer lawsuits are left with two options: (1)

apply *Cel–Tech* and require that unfairness be tied to some legislatively declared

policy or (2) adhere to the balancing test." *Spiegler*, 552 F.Supp.2d at 1045(internal quotation marks omitted).

### 3.  *"Fraudulent" Prong of the UCL*

Under the UCL's "fraudulent prong," "[a] violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Rather, it is only necessary to show that members of the public are likely to be deceived." *Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144, 1167 (2000).

### 4.  *Riviera's Conduct Constitutes a Violation of the UCL*

Here, Aeroflot established that Riviera manipulated the SABRE system to book airline seats in a higher class of service, manually price the seats and pay for the seats through ARC at a lower, unauthorized and unavailable price.  Aeroflot did not authorize Riviera to book the airline seats in this manner.  Riviera used passive booking codes as well, which SABRE prohibits.  Riviera also improperly acquired and sold 12 tickets where there were cross-border violations, using fraudulent destination points to obtain a lower, unauthorized and/or unavailable fare.  Finally, Riviera also submitted used tickets for refunds, knowing that the tickets had previously been used and intending to defraud Aeroflot.  In addition, at least one customer complained to Aeroflot about Riviera's imposition of a $420 fee to issue a refund on a ticket.  That customer complained to Aeroflot because the customer

believed Riviera to be an agent of Aeroflot.  Further, GTT permits Riviera to act as a

sub-agent, booking Aeroflot tickets.  Aeroflot adduced evidence that it could not

prohibit Riviera from acting as a sub-agent and those customers would have no way of

knowing that Riviera was an unauthorized agent of Aeroflot.  Accordingly, the Court

concludes that this evidence establishes violations of the UCL.

Riviera's manipulation of the reservation system, which allowed it to acquire

and sell Aeroflot seats at prices which were unavailable to other travel agents who

were operating lawfully, gave Riviera an unfair competitive advantage over its

competitors and was an unfair business practice in violation of California Business &

Professions Code §§ 17200 and 17203.  *See, e.g.,* Exhibit 29.  Riviera's conduct in

manually overriding the ticketing system, which allowed it to acquire seats from

Aeroflot's inventory which were otherwise unavailable, resulted in a disruption of

Aeroflot's planned inventory and its business and marketing plan for the marketing of

Aeroflot seats and is an unlawful and unfair business practice in violation of

California Business & Professions Code Sections 17200 and 17203.

Rivera's continued sale of Aeroflot tickets creates a reasonable risk that

Riviera's continued sale of Aeroflot tickets will create the false impression that

Riviera continues to be an authorized agent or representative of Aeroflot, thereby

justifying the issuance of an injunction against the further sale of Aeroflot tickets by

Riviera. *California Serv. Station etc. Assn. v. Union Oil Co.*, 232 Cal. App. 3d 44, 57,

30.

283 Cal. Rptr. 279, 285 (1991). Rivera's continued sale of Aeroflot tickets creates a reasonable risk that Riviera's continued sale of Aeroflot tickets will result in foreseeable harm to Aeroflot's reputation for which there is no adequate remedy at law.

Rivera's continued unauthorized booking and sale of Aeroflot tickets, which can create a reasonable but incorrect impression in the minds of the public that Riviera is an authorized agent of Aeroflot, are unlawful and unfair business practices which violate California Business & Professions Code Sections 17200 and 17203.

Riviera's conduct occurring both before and after Aeroflot terminated its business relationship with Riviera establishes that there is a reasonable foreseeable risk of: (1) future manipulation of the reservation system; (2) further unfair competition with travel agents regarding the booking and sale of Aeroflot seats; and/or (3) confusion in the minds of the public regarding Riviera's status as an authorized agent of Aeroflot which, among other things, can be damaging to Aeroflot's name and business reputation thereby justifying the issue of an injunction against the further sale of Aeroflot tickets. *Id.* For the reasons discussed herein, the Court orders that Riviera is enjoined from: (1) booking (reserving) seats on Aeroflot flights; (2) selling any tickets which include transportation on Aeroflot flights; and (3) representing itself to be an authorized agent of Aeroflot.

B. Riviera's Remaining Counterclaims:

Six causes of action remain against Aeroflot: (1) Unjust enrichment, Accounting, Equitable Tracing, and Imposition of Constructive Trust; (2) Trade Libel; (3) Defamation; (4) Tortious Interference with Prospective Economic Relationship (based on the tort of Defamation); (5) Breach of Business and Professions Code § 17200; and (6) Declaratory Relief.  Riviera's cause of action against Alexey Aleksandrov for Conversion remains as well.

*1. Unjust Enrichment, Accounting, Equitable Tracing, and Imposition of Constructive Trust*

Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another. *Lectrodryer v. SeoulBank,* 77 Cal.App.4th 723, 726 (2000). Some federal courts have identified a split in California law regarding whether unjust enrichment may exist as an independent cause of action rather than a theory permitting recovery under another cause of action. *See In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1114 (C.D. Cal. 2012 (holding "unjust enrichment is a theory that permits recovery on other recognized causes of action, including plaintiffs' UCL and CLRA claims" and not an independent cause of action).

The Court need not reach the question of whether unjust enrichment is an independent cause of action. Riviera alleged a violation of the UCL. The same remedies are available to Riviera under the claim for a violation of the UCL as those

available under a theory of unjust enrichment. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 63 P.3d 937 (2003) ("Restitution is the only monetary remedy expressly authorized by Bus. & Prof. Code, § 17203. Nothing in the legislative history indicates that the Legislature intended to authorize a court to order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits."). "[F]ederal courts have consistently . . . held that California law does not recognize a cause of action for unjust enrichment, so long as another cause of action is available that permits restitutionary damages." *In re ConAgra Foods Inc.*, 908 F. Supp. 2d at 1114. Just as the court ruled in *Falk v. General Motors Corp.*, there is no occasion to resort to unjust enrichment here. 496 F.Supp.2d 1088, 1099 (N.D.Cal.2007) (holding that the sole remedies available to plaintiff for unjust enrichment were available under the CLRA, UCL, and fraud by omission); *see also Bagget v. Hewlett-Packard Co.*, 582 F.Supp.2d 1261, 1271 (plaintiff could pursue his remedies through his claims for a violation of the UCL, but unjust enrichment claim "add[ed] nothing to his available relief.") Riviera has a remaining claim under the UCL, and as such the claim for unjust enrichment adds nothing to its available relief.[10]

Here, however, Riviera has failed to meet its burden of proof.   It has failed to establish that Aeroflot engaged in a fraudulent, unlawful, or unfair business activity. Riviera has not satisfied its burden of proving any amounts allegedly received by

---

[10] Regardless, Riviera has failed to proffer credible evidence that Aeroflot was unjustly enriched.

1  Aeroflot as a result of the allegedly improper conduct.

2

3      Furthermore, Riviera has not proven that any profits were taken from it, or that

4  it otherwise has an ownership interest in any alleged profits, because disgorgement of

5  profits in the absence of any ownership interest by the plaintiff goes beyond the

6

7  restitution that is authorized by the statute.  *Korea Supply Co. v. Lockheed Martin*

8  *Corp.*, 29 Cal. 4th 1134, 1144-1148, 131 Cal. Rptr. 2d 28, 63 P.3d 937 (2003).

9

10         2.  *Trade Libel, Defamation, and Tortious Interference with Prospective*
           *Economic Relationship (based on the tort of Defamation).*
11

12      Riviera bases its claims of Trade Libel, Defamation, Tortious Interference with

13  Prospective Economic Relationship (based on the tort of Defamation), and Breach of

14  Business & Professions Code § 17200 on the allegations that Aeroflot employees

15

16  made statements to Riviera's customers characterizing Riviera and its employees as

17  dishonest.  (Dkt. No. 232 at 2.)

18

19              a.  Trade Libel

20      "Trade libel is the publication of matter disparaging the quality of another's

21

22  property, which the publisher should recognize is likely to cause pecuniary loss to the

23  owner." *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010 (2001) (internal

24  citation and quotation marks omitted). This "encompasses all false statements

25

26  concerning the quality of services or product of a business which are intended to cause

27  that business financial harm and in fact do so." *Id*. "To constitute trade libel, a

28

statement must be false, but need not be malicious except in the sense that it was not privileged." *Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 572 (Ct. App. 1989).

### i.    Opinion versus Fact

A pernicious opinion cannot satisfy the elements for trade libel. *Hofmann Co. v. E. I. Du Pont De Nemours & Co.*, 202 Cal.App.3d 390, 397. To make the differentiation between an opinion and a factual statement "California courts have developed a totality of the circumstances test." *Id*. at 398 (citation and internal quotation marks omitted).

> First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense.... [¶] Next, the context in which the statement was made must be considered.... [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.

*Kahn v. Bower*, 232 Cal. App. 3d 1599, 1608 (Ct. App. 1991) (internal quotation marks omitted).

### b.  Defamation

"Defamation is an invasion of the interest in reputation." *Smith v. Maldanado,* 72 Cal.App.4th 637, 645, 85 Cal.Rptr.2d 397 (1999). "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." *Wong v. Tai Jing,* 189 Cal.App.4th 1354, 1369 (2010) (citing *Taus v. Loftus,* 40 Cal.4th 683, 720 (2007)).

"[T]he Supreme Court's teaching that '[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge can be justified.'" *Van Buskirk v. Cable News Network, Inc*., 284 F.3d 977, 982 (9th Cir. 2002) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)).

i.    Defamation versus Trade Libel

Though defamation and trade libel are similar in that "both involve the imposition of liability for injuries sustained through publication to third parties of a false statement affecting the plaintiff, the two torts are distinct." *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 549 (Ct. App. 1985). "The basic difference between the two torts, it has been noted, is that an action for defamation is designed to protect the *reputation* of the plaintiff, and the judgment vindicates that reputation, whereas the action for disparagement is based on *pecuniary damage* and lies only where such damage has been suffered." *Leonardini v. Shell Oil Co.*, 216 Cal. App. 3d 547, 573 (Ct. App. 1989) (citation and internal quotation marks omitted).

Here, Riviera failed to establish that any Aeroflot employee intentionally made false statements regarding Riviera.  *See* Witkin, Summary of California Law (10th Edition), Vol. 5, Torts, §§ 529, 530, 532, 551; Cal. Civ. Code § 46 .  Riviera failed to prove the falsity of the statement made by the sales manager of Aeroflot New York that Riviera was an "incompetent company".  Mikaelyan's testimony that "[Riviera is]

36.

not legit" and the instruction to "find some other place to get the tickets", as well as Buniatyan's testimony that "[Riviera] always issue invalid tickets" are ambiguous at best as to their meaning.  Even assuming that the statements lacked ambiguity, Riviera did not prove that the statements were false.[11]  Further, Riviera provided no evidence of pecuniary loss as a result of such statements.

In addition, Drobnjak's emails to ARC characterizing Riviera's conduct as "criminal activity" (Exhibits 145 and 146) were not shown to be false.  In contrast, Aeroflot presented credible evidence establishing, for example, that Riviera manipulated the SABRE reservation system and obtained refunds on used tickets.[12] Such conduct could truthfully be characterized as criminal.  Regardless, Riviera has failed to meet its burden of proving that it suffered any pecuniary loss as the result of any comments made by Aeroflot employees and alleged to be trade libel. *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010-11, 113 Cal. Rptr. 2d 625, 641 (2001), *citing Leonardini v. Shell Oil Co.*, 216 Cal.App.3d 547, 572, 264 Cal. Rptr. 883 (1989).

### c.  Tortious Interference with Prospective Economic Relationship

The elements for the tort intentional interference with prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third

---

[11] In fact, Aeroflot introduced evidence establishing that Riviera manipulated the SABRE system to book tickets in once fare class, but issue an illegitimate ticket in a lower fare class.  *See* Exhibit 29.

[12] Aeroflot also established that Aeroflot booked illegitimate tickets.  Exhibit 29.

party, with the probability of future economic benefit to the plaintiff; (2) the

defendant's knowledge of the relationship; (3) intentional acts on the part of the

defendant designed to disrupt the relationship; (4) actual disruption of the relationship;

and (5) economic harm to the plaintiff proximately caused by the acts of the

defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153

(2003) (quoting *Westside Center Associates v. Safeway Stores 23, Inc.*, 42

Cal.App.4th 507, 521-522 (1996)) (internal citation and quotation marks omitted).

Riviera bears the burden of pleading and proving that defendant's interference

was wrongful "by some measure beyond the fact of the interference itself." *Della*

*Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995); *see also*

*Korea Supply Co.*, 29 Cal. 4th at 1153 (applying *Della Penna* to a case involving a

charge of intentional interference with business relations).  Riviera has failed to meet

its burden to establish wrongful interference by Aeroflot.  Riviera has failed to

establish that Aeroflot engaged in intentional conduct designed to disrupt Riviera's

customer relationships.  In fact, Aeroflot would benefit economically if Riviera sold

Aeroflot tickets at the available prices.  Even assuming intentional acts, Riviera failed

to establish that any of Aeroflot's actions caused it any damages.

d.  Breach of Business and Professions Code § 17200

The elements of a cause of action based upon a breach of Business and

Professions Code section 17200 are detailed above and the Court will not repeat them

38.

here.  Once again, Riviera has failed to establish that Aeroflot engaged in fraudulent, unlawful or unfair business activity.  Riviera has not satisfied its burden of proving any amounts allegedly received by Aeroflot as a result of the allegedly improper conduct.  Furthermore, Aeroflot cannot be ordered to disgorge profits to Riviera because Riviera has not proven that any profits were taken from it, or that it otherwise has an ownership interest in any alleged profits, because disgorgement of profits in the absence of any ownership interest by the plaintiff goes beyond the restitution that is authorized by the statute.  *Korea Supply Co.*, 29 Cal. 4th at 1144-1148.

    *3.  Declaratory Relief*

    Declaratory relief is appropriate "in cases of actual controversy relating to the legal rights and duties of the respective parties," and allows a party to "bring an original action or cross-complaint ... for a declaration of his or her rights and duties ..., including a determination of any question of construction or validity arising under the instrument or contract ." Cal. Code Civ. P. § 1060. Declaratory relief is used as a "means of settling controversies between parties to a contract regarding the nature of their contractual rights and obligations." *Meyer v. Sprint Spectrum L.P.,* 45 Cal.4th 634, 647 (2009). It is "designed in large part as a practical means of resolving controversies, so that parties can conform their conduct to the law and prevent future litigation." *Id.* at 648. When there is little practical effect, "courts have considerable discretion, pursuant to Cal. Code Civ. P. § 1061, to deny declaratory relief because it

'is not necessary or proper at the time under all the circumstances.'" *Id.* (quoting Cal. Code Civ. P. § 1061). For example, declaratory relief is not granted in cases where it would "merely produce a useless trial." *People of California v. Kinder Morgan Energy Partners, L.P.,* 569 F.Supp.2d 1073 (S.D.Cal., 2008) (quoting *Silver v. City of Los Angeles,* 217 Cal.App.2d 134 (1963)).

Here, the Court's findings of facts provide that Aeroflot did not engage in improper conduct. Rather, as detailed herein, Riviera manipulated the SABRE system and gained a competitive and pecuniary advantage, while preventing Aeroflot from receiving the compensation for tickets it was owed.

### 4. Conversion

"'To establish a conversion, plaintiff must establish an actual interference with his *ownership* or *right of possession*.... Where plaintiff neither has title to the property alleged to have been converted, nor possession thereof, he cannot maintain an action for conversion.'" *Moore v. Regents of Univ. of California*, 51 Cal. 3d 120, 136 (1990) (footnote omitted) (quoting *Del. E. Webb Corp. v. Structural Materials Co.*, 123 Cal.Capp.3d 593, 610-11). "The gravamen of a conversion claim is the wrongful interference with another's property rights." *AmerUS Life Ins. Co. v. Bank of Am., N.A.*, 143 Cal. App. 4th 631, 642 (2006).

Riviera has failed to satisfy any of the elements of its cause of action for

Conversion alleged against Aleksandrov.  The evidence presented by Aeroflot established that Tumanian voluntarily agreed to provide the $30,000 check to Aeroflot as a gesture of its good will.  The testimony of Novokshonov and Aleksandrov was specifically corroborated by Tumanian's letters dated December 1, 2010 and December 7, 2010, Exhibits 26, and 31.  Accordingly, Riviera's Conversion claim fails.

Judgment is for Plaintiff.

**IT IS SO ORDERED.**

Dated:  June 25, 2014

By:_____
HON. BEVERLY REID O'CONNELL
United States District Court Judge